UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| WESTWOOD ONE, LLC, | ) |
| Plaintiff, | ) |
| v. | ) Cause No. 1:21-CV-88-HAB |
| LOCAL RADIO NETWORKS, LLC, | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This infringement case has now reached the claim construction stage. The parties have submitted their briefs (ECF Nos. 64, 65, 70, 71) and the issue is ripe for a decision.

**I.   Background Facts**

There are two patents at issue: U.S. Patent Nos. 7,860,448 ("448 Patent") and 7,412,203 ("203 Patent"). The Court has described the patents at length in its Opinion and Order on Defendant's motion for judgment on the pleadings. (*See* ECF No. 45 at 1-6). The Court will not repeat that description here. In summary, the 448 Patent is a system for connecting local radio stations and content providers, by which local radio stations can directly request local broadcast content through a central computer program. The 203 Patent takes a standard network broadcast feed and breaks it into distinct content files, allowing local radio stations to organize those files around local content breaks.

The parties now dispute the construction of seven terms and phrases used in the patents: "local generated content files"; "each radio station may specify either that none or a preselected individualized amount and time of locally generated content files shall be retrieved, played and broadcast"; "computer readable media"; "recorded content"; "recorded broadcast content";

"transmit[ting] the first [second] recorded [broadcast] content to the first [second] broadcast affiliate"; and "at least one of i) local content, ii) pre-local content, and iii) sponsors."

## II. Legal Discussion

### A. *Claim Construction Standards and Rules*

Claim construction "is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Embrex, Inc., v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (internal quotations and citation omitted). Generally, a trial court need not construe claim terms whose meaning the parties do not dispute. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2006). Further, a court construing patent claim terms need not adopt the constructions proposed by the parties and should determine its own constructions if it determines the parties' proposals to be legally flawed. *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1323–24 (Fed. Cir. 2008), abrogated on other grounds by *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). *But see Yoon Ja Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1319 (Fed. Cir. 2006) ("While we may have the authority to adopt claim constructions which have not been proposed by either party we should be hesitant to do so."). The disputed claim terms need only be construed sufficiently to resolve the issues in a given case. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation and internal quotation marks omitted). Accordingly, "[c]laim construction begins and ends in all cases with the actual words of the claim." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (citation and internal quotation marks omitted).

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of the record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)); *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1326 (Fed. Cir. 2014). "Words in a claim are generally given their ordinary and customary meaning." *Vitronics*, 90 F.3d at 1582. But "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Id.*; *see also Thorner v. Sony Comp. Entert. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed term' other than its plain and ordinary meaning.") (citation omitted). "It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term." *Thorner*, 669 F.3d at 1365 (quoting *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008)).

"Thus, second, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id.* (citing *Markman*, 52 F.3d at 979). "Claims must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979.

"Third, the court may also consider the prosecution history of the patent, if in evidence." *Vitronics*, 90 F.3d at 1582. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor

limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. Claim terms should not be construed one way during prosecution and another way during claim construction in litigation. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005).

If intrinsic evidence is not enough to construe the disputed terms, extrinsic evidence such as dictionary definitions and prior art is considered. *See Vitronics*, 90 F.3d at 1584. Importantly, "while extrinsic evidence 'can shed useful light on the relevant art'. . .it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)).

**B.**     ***The Disputed Language***

**1.**     *"locally generated content files"*

Plaintiff proposes that this language be construed as "local content files generated by or for a local radio station." Defendant counters with "content files generated by a computer belonging to or controlled by a radio affiliate."

The Court agrees with Defendant that the distinction between the parties' constructions is whether "locally generated" encompasses content files generated by the content provider — the network. Having reviewed the parties' arguments on this point, the Court sides with Defendant.

The parties spend most of their time arguing about the meanings of different phrases in the description, but the Court finds that the language of the claims themselves is clear. *Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("the analytical focus must begin and remain centered on the language of the claims themselves"). The claims discuss actions by two distinct entities: the "radio station" on the one hand, and the "radio [station] network" on the other. In claim one, the patent discusses "[a] method for operating a radio station." (ECF No.

63-1 at 13, clm. 9, l. 2). One of the methods for operating the radio station is "periodically creating locally generated content files." (*Id*. at l. 5). This claim expressly contemplates that locally generated content files are "create[d]" by the radio station, not the network.

Claim four, on the other hand, describes a "method for operating a radio station network." (*Id*. at l. 34). Within that claim, the network will "periodically send generic content files…to affiliate radio stations." (*Id*. at l. 36–38). In the very next clause, the claim describes the station as "storing the generic content files and storing locally generated content files." (*Id*. at 39–40). This claim, then, distinguishes between generic content files sent by the network and locally generated content files that are separately stored by the stations.

Claim eight draws an even clearer distinction. The eighth clause of that claim describes how the stations can use an automated system for playing its content files. The claim describes how a station can, during breaks from the network's generic, or non-localized content, play more localized content. It states, "such that the first automation system stops sequentially executing the *network originated* generic content files and causes the *locally originated* content files…to be played." (*Id*. at clm. 10, ll. 40–44) (emphasis added). At the "completion of the playback of the locally generated content files during a given break, the first automation system seamlessly resumes retrieving, playing and broadcasting the generic content files." (*Id*. at 46–49). Stated another way, the claim describes a situation where an automated system takes a break from network originated content, plays locally originated content and, when that ends, resumes playing network originated content. That the claim interchangeably uses the phrases "locally originated content files" and "locally generated content files" suggests that locally generated content files must originate from a source other than the network. That claim 14 also uses the phrases interchangeably only further cements this conclusion. (ECF No. 63-1 at 14, clm. 11, ll. 9–17).

5

This does not mean, however, that the Court agrees with the hyper-local construction advanced by Defendant. Instead, the Court agrees with Plaintiff that Defendant's focus on computers "belonging to or controlled by a radio station" to be too restrictive and confusing.

Consider Defendant's suggestion that the content files must be "generated by a computer." What does that mean? Defendant asserts that this language is consistent with the 203 Patent's description of files being recorded with computer programs. (ECF No. 70 at 7). Maybe, but the Court finds the phrase "generated by" to be materially different from "recorded with." This opinion has been written using a computer, but the Court and its clerks would balk at the suggestion that it was "generated" by one. To suggest that "generated by" is the functional equivalent of "recorded with" or "stored on" strays from the ordinary and customary way that word is defined. *See Generate*, Mirriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/generate (last visited Dec. 20, 2022) (defining "generate" as "to bring into existence" and "to be the cause of").

Also confusing is Defendant's requirement that local content must be generated by computers that "belong to" or are "controlled by" the local station. Defendant's briefs give this part of its proposed construction short shrift. Defendant concentrates on the term "locally," stating only that "controlled by" is "an attempt to capture contractors at the affiliate side that use the software to generate files." (ECF No. 70 at 9). That may be the intent, but it does not follow from the language used. The Court would be hard-pressed to conclude that a computer owned by a contractor somehow "belonged to" or was "controlled by" a radio station simply through a contract that the contractor provide radio content.

Thankfully, the Court is not bound by the parties' suggested constructions, but "may adopt a definition not proposed by either party that best fits with the claim language and specification."

6

*Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1376 (Fed. Cir. 2017). In line with what the Court views as the true distinction between the two constructions, the Court adopts its own construction. The phrase "locally generated content files" is construed to mean "local content files generated for a local radio station by a person or entity other than a radio network." This construction complies with the claims' clear distinction between locally generated and network generated content. It also eliminates any confusion created by requiring computer generated content, as well as the confusion created by requiring that the computers generating the content be owned or controlled by the radio station.

**2.**     *"each radio station may specify either that none or a preselected individualized amount and time length of locally generated content files shall be retrieved, played and broadcast"*

Plaintiff proposes that this phrase be construed consistent with its plain and ordinary meaning. Defendant counters by proposing a construction of "each radio station optionally specifies either that none or a preselected individualized amount and time length of locally generated content files shall be retrieved, played and broadcast." The parties agree that the only part of this claim term in dispute is the "may specify" language. (ECF No. 73 at 4).

The Court agrees with Plaintiff. As the parties' competing case law demonstrates, the word "may" can have different meanings depending on the context. Here, Claim 8 uses the disputed phrase when describing the capabilities of an "automation system"; i.e., a computer program that plays the content files. That automation system allows each radio station, during breaks, to specify either none or a preselected individualized amount of content files. That is the plain language of the claim. It is not, as Defendant asserts, language specifying what a radio station can do independent of the automation system. It is this plain language of the claim that must control. *Compuserve*, 256 F.3d at 1331.

The Court is not moved by Defendant's citation to *In re Johnson*, 435 F.3d 1381 (Fed. Cir. 2006). There, the patent was for a large diameter steel pipe. Claim 3 described the pipe, stating that the wall of the pipe "may be smooth, corrugated, or profiled with increased dimensional proportions as pipe size is increased." *Id*. at 1384. The Federal Circuit interpreted "may" in that context to indicate "optional elements" of the pipe, noting that they "can always be omitted." *Id*.

The claims here are not describing the physical characteristics of the automation system or the radio stations. They are not describing elements of the patent that can be omitted. Indeed, omitting everything after "may" would make no sense here, as it would leave the radio station with nothing to do. The Court cannot assign a construction that does not make sense. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 682 (Fed. Cir. 1995). The Court agrees with Plaintiff that the phrase does not need construction and it will be given its plain and ordinary meaning.

**3.**   *"Computer-readable media"*

Plaintiff proposes that this phrase be construed consistent with its plain and ordinary meaning. Defendant counters by proposing a construction of "transitory or non-transitory computer-readable media." The dispute, as far as the Court can see, is whether the phrase includes transitory media — radio waves or the internet.

Turning first to the intrinsic evidence. Plaintiff first points to the requirement in claims 1 and 17 that a computer program be "stored" on computer-readable media. Plaintiffs argue, and their expert agrees, that "a signal *per se* from a network, while it is a medium that is computer-readable, cannot 'store' instructions." (ECF No. 64-1 at 26); *Data Engine Techs. LLC v. Int'l Bus. Mach. Corp.*, No. 6:13-cv-860-RWS-JSL, 2015 WL 3407254, at *6 (E.D. Tex. May 27, 2015). Plaintiff's expert gives the example of a home Wi-Fi network, reasoning:

> It is possible for a computer or smartphone to interpret the signal as a stream of digital information, but it is not possible to store anything in the Wi-Fi signal. The

8

>Wi-Fi network can be used to connect to a physical device that stores information, but it is not by itself a means for storage.

(ECF No. 64-1 at 27). This makes sense to the Court.

Defendant's response to this common-sense description takes two forms. First, it points to the affidavit of its own expert who, after studying the use of "computer-readable medium" in other patent applications concluded that the phrase "would ordinarily be understood to encompass media that store or record information for a brief period of time, such as communication media, carrier waves, or other transitory media." (*Id*. at 48). But, as Defendant's expert admits, this opinion is based on "extrinsic evidence." (*Id*.). This opinion, then, is necessarily of little use to the Court to the extent that it conflicts with the plain language of the claims. *Phillips*, 415 F.3d at 1318 ("a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history") (quotations omitted).

Defendant's second response relies on the USPTO's Patent Trial and Appeals Board's ("PTAB") decision in *Ex parte Mehwherer*, 107 U.S.P.Q.2d 1857 (P.T.A.B. 2013). There, the PTAB concluded that the term "machine readable storage medium" encompassed "both nontransitory and transitory media." *Id*. at *3. But as Plaintiff notes, PTAB uses "the broadest reasonable interpretation" standard in construing patent terms. *Id*. at *6. "District courts, by contrast, do not assign terms their broadest reasonable interpretation. Instead, district courts seek out the correct construction—the construction that most accurately delineates the scope of the claimed invention—under the framework laid out in *Phillips*." *PPC Broadband, Inc. v. Corning Optical Comm'ns RF, LLC*, 815 F.3d 734, 740 (Fed. Cir. 2016). The different standards can, and do, lead to different outcomes. *See id*. at 741 ("This case hinges on the claim construction standard

applied—a scenario likely to arise with frequency."). *Mehwherer*, then, does little to inform this Court's analysis.

Contrary to Defendant's arguments, the Court finds that the intrinsic evidence supports Plaintiff's interpretation. All examples of computer readable media given in the patent specification are non-transitory media: fixed or removable disks, RAMs and ROMs. (ECF No. 63-2 at 18). The Court recognizes the general rule that claims of a patent are not limited to the examples listed in the patent, *Dow Chem. Co. v. U.S.*, 226 F.3d 1334, 1342 (Fed. Cir. 2000), but those examples can still aid in the proper interpretation of a claim term. *Ekchain v. Home Depot, Inc.*, 104 F.3d 1299, 1303 (Fed. Cir. 1997). The Court finds it compelling that there is no indication of transitory media within the relevant parts of the specification, particularly where it seems clear that transitory media cannot perform the storage function required.

The prosecution history also supports Plaintiff's interpretation. As originally filed, the 448 Patent stated that computer-readable media could be "distributed over a network." The examiner rejected this language as "effectively claiming a signal, which is not patentable under 35 U.S.C. § 101." But Plaintiff agreed to remove the language from the specification (ECF No. 63-4 at 137), suggesting to the Court that transitory media was being expressly excluded from the definition of computer-readable media.

Defendant has a different take on this prosecution history. Defendant points to Plaintiff's agreement to remove the "distributed over a network" language where Plaintiff stated that it, by making the change, did "not disclaim any breadth of claim coverage by making this amendment." (*Id*.). Defendant views this clarification as an "*unequivocal* statement" that transitory media remained part of the definition. (ECF No. 65 at 15) (original emphasis).

The Court concedes that Defendant's reading of the prosecution history is a reasonable one. If the claim is the same with or without "distributed over a network" language, then perhaps transitory media is implicit in the definition of computer-readable media. But an equally reasonable reading of the history is that the claim never intended to include transitory media, so deleting "distributed over a network" did not change the claim. Given everything stated above, the Court concludes that this second reading more closely tracks the intrinsic evidence.

Because the Court concludes that the intrinsic evidence controls, there is no reason to resort to extrinsic evidence. *Vitronics*, 90 F.3d at 1584 ("Only if there was still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence, should the trial court have resorted to extrinsic evidence, such as expert testimony."). The Court construes "computer-readable media" to have its plain and ordinary meaning, which excludes transitory media.

**4.**     *"recorded content"*

Plaintiff proposes that this phrase be given its plain and ordinary meaning but, if construction is required, proposes that it be construed as "content that has been recorded." Defendant, on the other hand, proposes that the phrase be construed as "a digital audio or audiovisual file created during an audio or audiovisual recording process." The dispute presents two issues: 1) whether the phrase is limited to digital files or also includes analog recordings; and 2) whether the phrase is limited to the original recording created by a recording artist.

The Court agrees with Defendant that including analog recordings in the construction of "recorded content" is nonsensical in the context of the 448 Patent. The problem for Plaintiff is that "recorded content" refers both to content created and content transmitted. (*See*, *e.g.*, ECF No. 63-2 at 21, col. 9, l. 23 – col. 10, l. 7). The only way content is transmitted in the '448 patent is

11

digitally. (ECF No. 63-2 at 4). It makes no sense, then, to construe "recorded content" in the transmission context to encompass a tape reel that cannot be transmitted over the internet.

This construction necessarily affects the way the Court construes the term in the recording context. Unless otherwise compelled, the Court must construe the same claim term in the same patent to have the same meaning. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003). While it is conceivable that a recording artist could record content in an analog format, convert it to a digital format, and then transmit it, nothing in the patent compels the Court to construe "recorded content" differently depending on how it is used. And since a digital format works for all contexts where analog does not, the Court concludes that the term can only encompass digital content.

The Court is not similarly convinced by Defendant's attempt to restrict "recorded content" to the original recording. While the constituent parts of a piece of "recorded content" must be created during a recording session, the Court finds that one would ordinarily understand a recording to include edits. *See*, *e.g.*, https://www.copyright.gov/eco/gram-sr/author.html (defining the author of a sound recording as including "the producer who captured, manipulated, and/or edited the sounds that appear in the final recording"). The Court sees nothing in the '448 patent that restricts the recording artist from editing content into a final form.

Because the Court has split the baby, it adopts neither party's construction and adopts its own. *Homeland Housewares, LLC*, 865 F.3d at 1376. The Court construes "recorded content" to be "content that has been digitally recorded."

**5.** *"recorded broadcast content"*

Plaintiff proposes that this term be given its plain and ordinary meaning but, if construction is required, that it be construed as "broadcast content that is recorded." Defendant counters with a

construction of "a digital or audiovisual file created during an audio or audiovisual recording process."

The parties largely rely on their arguments on "recorded content" when addressing "recorded broadcast content." The Court will follow suit. For the reasons in subpart (II)(B)(5) above, the Court construes "recorded broadcast content" to mean "broadcast content that has been digitally recorded."

**6.**     *"transmit[ting] the first [second] recorded [broadcast] content to the first [second] broadcast affiliate"*

Plaintiff proposes that this term be given its ordinary and plain meaning unless it incorporates other terms that have been proposed for construction. Defendant counters with a construction of: "to cause the recorded [broadcast] content to be sent from the recording computer to a computer belonging to or controlled by the broadcast affiliate." Defendant clarifies in its response brief that the dispute is over "**what**" is transmitted. (ECF No. 70 at 21) (original emphasis). Defendant asserts that its construction is meant to clarify that "[i]t is the recorded [broadcast] content that was recorded by the recording artist—not some other file that derives from that file—which is sent to the broadcast affiliate." (*Id.*).

The Court views Defendant's argument as little more than a restatement of its original recording argument made regarding "recorded content." The Court is no more convinced that recorded content is limited to some unedited recording when used in this disputed phrase than it was when recorded content was used on its own. Because the Court believes that editing is a core part of the broadcast media, it rejects the idea that only an unedited, original broadcast is what is contemplated in the 448 Patent.

As for Defendant's suggestion that the term should be limited to a "computer belonging to or controlled by" a broadcast affiliate, the Court has already concluded that this language is unduly

confusing and unnecessary. *See* subpart (II)(B)(1) above. There is no reason to conclude differently now.

The Court rejects Defendant's attempts to construe the disputed term beyond the extent to which it has already been construed. The Court will give this term its plain and ordinary meaning unless it incorporates other terms that have already been construed.

**7.** *"at least one of i) local content, ii) pre-local content, and iii) sponsors"*

Plaintiff argues that this term, which appears only in claim 2 of the 448 Patent, be given its plain and ordinary meaning unless it incorporates other terms that have been proposed for construction. Defendant proposes that the term be construed as "at least one local content, at least one pre-local content, and at least one sponsor."

Defendant's argument rests only on *Superguide Corp. v. DirectTV Enter., Inc.*, 358 F.3d 870 (Fed. Cir. 2004), and its progeny. In *Superguide*, the Federal Circuit found "[t]he phrase 'at least one of' precedes a series of categories of criteria, and the patentee used the term 'and' to separate the categories of criteria, which connotes a conjunctive list. . . . Therefore, the district court correctly interpreted this phrase as requiring that the user select at least one value for each category." *Id*. at 886. As Defendant notes, "[i]n other words, at least one of A, B, and C, means that the claim language requires at least one A, one B, and one C." (ECF No. 65 at 23).

But the rule in *Superguide* is not absolute. *See* ECF No. 64 at 29–30 (collecting cases). And Defendant points to nothing in the 448 Patent that supports the application of *Superguide* to this case. Instead, in all its briefing on this term Defendant cites to only one sentence from the 448 Patent: "[t]he computer program **200** may prompt a user for descriptions of various and plural types of localized broadcast content, such as local content, pre-local content, weather sponsors, weather content, and override content." (ECF No. 63-2 at 18, col. 3, ll. 23–26). But this sentence

shows only that localized broadcast content is made up of several types of content. And claim 1, on which claim 2 is based, requires the computer program invention to prompt a user for only one description from that list of types (*Id*. at 19, col. 6, l. 60 – 20, col. 7, l. 16), and each of those types has its own interface for entering the information (*Id*. at 6–10). There is simply no basis in the language of the patent itself, outside the non-universal *Superguide* rule, to adopt Defendant's proposed construction.

The Court does not discount Defendant's common-sense argument that "and" means "and." But even this simple conjunction can be context dependent. Consider a menu at a fancy restaurant. Under a three-course chef's dinner, the menu prompts diners to select "one of (1) an appetizer, (2) an entrée, and (3) a dessert." The clear intent is that the diner selects one of each; it's not much of a three-course dinner if you only get one course. But if the diner drops down a level to the entrees and is prompted to pick "one of (1) the chicken, (2) the steak, and (3) the fish," the intent changes. No one is going to expect to get all three, lest the dinner turn into a real-life version of Monty Python's The Meaning of Life. The same verbiage, two contexts, two different constructions.

The language in the 448 patent is the entrée list: a collection of examples from one category rather than a list of categories. When viewed in the context of the larger patent, it is clear to the Court that only one of the three examples is required, not one of each. This is the interpretation that is required by the intrinsic evidence.

Because the Court finds that *Superguide* is inapplicable here, it cannot accept Defendant's proposed construction. The Court construes the term to mean at least one of the three options— local content, pre-local content, and sponsors—rather than one of each.

### III. Conclusion

For these reasons, the Court construes the disputed terms as set forth above.

SO ORDERED on April 25, 2023.

                                                s/ Holly A. Brady  
                                               JUDGE HOLLY A. BRADY  
                                               UNITED STATES DISTRICT COURT